**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**

**Lynchburg Division**

In re: RUNNYMEDE CAPITAL MANAGEMENT, INC. Case No. 17-61506-RBC
Chapter 7

Debtor

---

W. STEPHEN SCOTT, TRUSTEE AP NO. __________

Plaintiff

v.

SUNTRUST BANK

Serve:
William H. Rogers, Jr.
Chairman, SunTrust Bank
303 Peachtree St. N.E.
Atlanta, GA

Defendant

**COMPLAINT TO AVOID AND RECOVER TRANSFERS**

W. Stephen Scott, Chapter 7 Trustee ("Trustee"), by counsel, for his Complaint to Avoid and Recover Transfers respectfully states as follows:

John M. Ryan, VSB No. 37796
CROWLEY, LIBERATORE, RYAN & BROGAN, P.C.
150 Boush Street, Suite 300
Norfolk, VA 23510
Telephone: (757) 333-4500
Facsimile: (757) 333-4501

*Counsel for W. Stephen Scott, Trustee*

## Jurisdiction and Parties

1. Creditor Lynne J. Kinder ("Mrs. Kinder") filed a petition for involuntary bankruptcy ("Involuntary Petition") against Runnymede Capital Management, Inc. ("Runnymede" or the "Debtor") in the United States Bankruptcy Court for the Western District of Virginia ("Court") on August 2, 2017.

2. On August 3, 2017, the Court issued a Summons to Debtor in Involuntary Case against Runnymede. No person contested the summons.

3. The Court entered an Order for Relief on September 26, 2017, and appointed W. Stephen Scott to serve as Chapter 7 Trustee ("Trustee").

4. The Trustee brings this action pursuant to 11 U.S.C. §544(b) (1), 11 U.S.C. § 550, and §§ 55-80 and 55-81 of the Code of Virginia, to avoid transfers by Runnymede to SunTrust Bank.

5. Defendant SunTrust Bank is a Georgia corporation and federally insured depository institution with a principal place of business located at 303 Peachtree Street, N.E., Atlanta, Georgia. On belief, SunTrust is the parent or successor by merger of SunTrust Mortgage, Inc. SunTrust and SunTrust Mortgage are referred to collectively hereinafter as "SunTrust".

6. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. This matter is a core proceeding including as defined in 28 U.S.C. § 157.

## Background

7. Mrs. Kinder's late husband, Trey Kinder ("Mr. Kinder"), was a successful attorney and businessman. He died suddenly in Richmond, Virginia, on December 31, 2005, at age 41.

8. At Mr. Kinder's funeral and thereafter, Mr. Kinder's childhood friend Victor M. Dandridge, III ("Dandridge") offered to provide investment management and advice to Mrs. Kinder and her family.

9. Dandridge pitched his investment skills and contacts in his letter to Mrs. Kinder dated January 16, 2006, attached hereto as **Exhibit A**.

10. Mrs. Kinder, mother of two small children, in crisis and without investment experience, accepted Dandridge's offer and authorized Dandridge to manage her family assets and accounts totaling approximately $6.5 Million (collectively, the "Kinder Assets").

11. The Charlottesville offices and officers of SunTrust and its predecessor Crestar Bank had longstanding relationships with Dandridge, his family and their businesses.

12. SunTrust and Dandridge significantly expanded the relationships after Dandridge started managing the Kinder Assets. SunTrust assigned its officer Charles Du Bose to Dandridge as his relationship banker.

13. The expansion profited SunTrust, and on belief Du Bose, and involved new accounts, loans and entities, including the following.

**Growth of the SunTrust Deposit and Lending Relationships**

14. Less than two weeks after Mr. Kinder's death, on January 12, 2006, Dandridge formed Runnymede Capital Management, Inc., the debtor herein ("Runnymede" or the "Debtor").

15. The very next day, January 13, 2006, Dandridge, as President of Runnymede, opened deposit and checking Account No. ended 6930 in the name of Runnymede Capital Management Inc. at SunTrust (account referred to hereinafter as "Runnymede 6930").

16. According to statements prepared by Dandridge, Dandridge directed $1.4 Million

in Kinder Funds to Runnymede by June 30, 2006.[1]

River House Purchase

17. Dandridge and his wife Ann Claiborne Dandridge ("Mrs. Dandridge") purchased a vacation home located at 678 Springfield Road, Westmoreland County, Virginia, and other property nearby. In or about August 2006, SunTrust loaned Dandridge and Mrs. Dandridge at least $500,000 related to purchase of this property (the "River House Loan").

Wycliffe

18. In October 2006, Wycliffe Capital Management, Inc. ("Wycliffe"), an entity owned by Dandridge, borrowed $125,000 from SunTrust under a revolving line of credit (the "Wycliffe LOC"). Dandridge arranged the Wycliffe LOC as President and guarantor of Wycliffe.

19. In or about October 2006, Wycliffe and SunTrust opened deposit and checking Account No. ended 9571 at SunTrust ("Wycliffe 9571").

Timberlake Lighting

20. In or about July 10, 2007, Mr. and Mrs. Dandridge formed and became the sole officers and directors of Timberlake Acquisition Corporation which would later change its name to Timberlake Lighting, Inc. ("Timberlake").

21. Timberlake was a wholesale and retail lighting company known as Timberlake Lighting with locations in Charlottesville and Lynchburg, VA.

22. Timberlake filed a bankruptcy petition with the Court under Chapter 7 on February 20, 2017 (Case No. 17-60318).

23. Dandridge and Mrs. Dandridge were the sole owners and officers of Timberlake

---

[1] SunTrust has stated that it has no access to SunTrust account information for Runnymede and Dandridge between January 1, 2006, and December 31, 2008.

from July 10, 2007 until in or about September 2016.

Timberlake Borrowing

24. On July 13, 2007, Timberlake obtained a $150,000 revolving line of credit (the "Timberlake LOC") from SunTrust.

25. On or before July 13, 2007, Timberlake and SunTrust opened deposit and checking Account No. ended 9555 at SunTrust ("Timberlake 9555").

Dandridge Commercial Note

26. On the same date as the Timberlake LOC, Dandridge and Mrs. Dandridge borrowed $1,258,000.00 from SunTrust as individuals, to purchase or capitalize a business which is believed to have been Timberlake. SunTrust Commercial Note attached hereto and labeled **Exhibit B** for identification purposes (the "Commercial Note").

27. The Commercial Note afforded SunTrust security interests in all deposits and investments of the Borrower, defined to include Dandridge and Mrs. Dandridge individually and collectively, with SunTrust.

**Count I – Virginia Code Section 55-81 – Constructive Fraudulent Transfer**

28. According to the SunTrust account records available at this time, between January 1, 2009, and December 31, 2011, as set forth on **Exhibit C**, Dandridge directed $2,193,728.17 in Kinder Funds into Runnymede 6930 via 33 separate transfers (the "Kinder Transfers In").

29. The Kinder Transfers In created liabilities of Runnymede to Mrs. Kinder.

30. From January 1, 2009 to December 31, 2011, Runnymede transferred $2,461,578.40 from Runnymede 6930 to Dandridge 5935 via the 71 transfers to Dandridge 5935 set forth on **Exhibit D**.

31. From January 1, 2009, to December 31, 2011, Runnymede transferred $782,000

from Runnymede 6930 to Timberlake 9555 via the 16 transfers to Timberlake 9555 set forth on **Exhibit D.**

32. From January 1, 2009, to December 31, 2011, Runnymede transferred $51,116.12 to Wycliffe 9571 via the 27 transfers to Wycliffe 9571 set forth on **Exhibit D.**

33. The transfers listed on **Exhibit D** total $3,294,694.52 and are referred to hereinafter as the "Runnymede Transfers Out".

34. The Runnymede Transfers Out depleted the estate of Runnymede and left Runnymede with no or insufficient assets with which to pay the liabilities to Mrs. Kinder resulting from the Kinder Transfers In.

35. Title to the funds passed from Runnymede to SunTrust upon their deposit into Dandridge 5935.

36. At the time of each of the Runnymede Transfers Out, Kinder was a creditor of Runnymede.

37. Each of the Runnymede Transfers Out occurred while Runnymede was insolvent or, in the alternative, each of the Runnymede Transfers Out caused Runnymede to be insolvent.

38. Runnymede did not receive consideration deemed valuable at law in exchange for any of the Runnymede Transfers Out.

39. SunTrust, however, received hundreds of thousands of dollars in payment of loans owed by Dandridge and Dandridge related entities other than Runnymede, which payments originated with the Runnymede Transfers Out or other transfers from Runnymede.

WHEREFORE, for the foregoing reasons, W. Stephen Scott, Chapter 7 Trustee, by counsel, requests entry of judgment against SunTrust in the amount of $3,294,694.52, and for such other and further relief as to this Court seems just.

**Count II – Va. Code § 55-80 – SunTrust Received Transfers Intended To Defraud Mrs. Kinder With Notice of Dandridge's Fraudulent Intent**

40. The Trustee restates allegations 1-39 as if set forth verbatim herein.

41. Runnymede made the Runnymede Transfers Out with the intent to defraud Mrs. Kinder.

42. SunTrust, as banker to Dandridge and his related companies, and as an investment advisor to Dandridge, was on notice of Dandridge's and Runnymede's fraudulent intent and on notice of facts that should have prompted it to investigate the Runnymede Transfers Out.

43. SunTrust knew Dandridge as a loan applicant whom SunTrust subjected to underwriting.

44. SunTrust assigned an investment advisor to work with Dandridge and Du Bose, and also knew Dandridge as an investment prospect and client.

45. SunTrust has at all relevant times reviewed and had both special knowledge of Dandridge's sources of income and immediate and continuous access to the accounts and other financial information of its borrowers Dandridge, Timberlake and Wycliffe Capital Management, for multiple purposes.

46. The full extent of SunTrust's knowledge is not known at this time.

47. At and after the date of the Wycliffe LOC, and likely long before that, SunTrust knew Dandridge derived income as an investment advisor.

48. At all relevant times, SunTrust knew that Dandridge had no regular source of income.

49. SunTrust knew or should have known that Dandridge was not a licensed investment advisor at the time of the Runnymede Transfers Out, nor was he employed by one.

50. In July 2007, at the time of the Timberlake LOC and Commercial Loan, SunTrust knew Dandridge was borrowing on several fronts, including most substantially for Timberlake, a new business with no proven source of revenue.

51. On belief, SunTrust knew that Timberlake, a new business and borrower whose financial performance SunTrust would be expected to review, did not make money, ever.

52. As far back as documents are currently available, SunTrust wire transfer receipts describe Mrs. Kinder as the source of each of the Kinder Transfers In and acknowledge her beneficial interest in the funds deposited into Runnymede 6930.

53. SunTrust knew that most of the Runnymede Transfers Out went directly to Dandridge and his family and that the balance went to companies indebted to SunTrust, known to be owned and controlled by Dandridge, and in which Mrs. Kinder had no interest.

54. SunTrust knew or should have known that the Runnymede Transfers Out to Dandridge 5935 supplied much of the income of Dandridge and his family.

55. The 71 Runnymede Transfers Out were in substantial irregular amounts, ranging in amount from $5,100 to $200,000.

56. Many of the 71 Runnymede Transfers Out to Dandridge 5935 occurred on the same date as or within days or weeks of a corresponding Kinder Transfer In, precluding any appearance of a legitimate business or investment purpose for the Kinder Transfers In and Runnymede Transfers Out.

57. SunTrust bank statements disclose that Dandridge used the Runnymede Transfers Out to pay approximately $10,000 a month in mortgage payments, tens of thousands in monthly credit card bills, thousands in car loans and additionally funded hundreds of thousands of dollars in wire transfers out of Dandridge 5935.

58. The Runnymede Transfers Out paid hundreds of thousands of dollars in mortgage or other loan payments to SunTrust for the exclusive benefit of persons other than Runnymede.

59. SunTrust knew or should have known that the Runnymede Transfers Out were unusual for multiple reasons and exceeded any reasonable investment fee or distribution to Runnymede or Dandridge.

60. The Trustee's knowledge of payments to SunTrust originating from Runnymede Transfers Out or other sources is also incomplete, and the Trustee will amend as additional information is gained through discovery.

**Failing Business and Fraudulent Inducement**

61. SunTrust was on further notice of fraudulent intent where SunTrust knew or should have known the businesses to which Runnymede directed the Runnymede Transfers Out were troubled.

62. From 2009 to 2011, Runnymede transferred $782,000 to Timberlake as reflected in Exhibit E.

63. SunTrust had access to and could be expected to review Timberlake tax returns. On belief, Timberlake operated at a loss every year from opening in 2007 to its bankruptcy filing in 2017.

64. Mr. and Mrs. Dandridge were regularly in default to SunTrust under the Commercial Note.

65. Mr. and Mrs. Dandridge did not pay the Commercial Note upon maturity on July 31, 2010.

66. Prior to January 26, 2011, SunTrust declined to extend or renew the Commercial Loan on existing terms.

67. On belief, in or about March 2011, SunTrust agreed to renew the Commercial Note only upon satisfaction of certain preconditions, including that Mr. and Mrs. Dandridge:

    a. Provide additional collateral; and

    b. Curtail the Commercial Loan principal by $100,000 at closing on the renewal and by $100,000 annual principal curtailments thereafter.

68. Dandridge fraudulently induced Mrs. Kinder to put up her family home as collateral for the Commercial Note, including by his statements in the email attached hereto and labeled **Exhibit E.**

69. Despite months of opportunity to do so, SunTrust never discussed the loan or its status with Mrs. Kinder.

70. In order to close on the renewal of the Commercial Loan, by fraudulent transfers known only to Dandridge and SunTrust, Dandridge transferred $300,000 from Runnymede 6930 to Dandridge 5935 in February and March 2011, and $110,841.21 from Dandridge 5935 to the closing attorney for the renewal on March 7, 2011, to make the $100,000 principal curtailment at closing and pay SunTrust renewal fees, charges and closing costs.

<u>SunTrust Facilitates Dandridge's Theft From Mrs. Kinder and Her Daughters</u>

71. SunTrust was on further notice of Dandridge's fraudulent intent on or about September 14, 2011, as a result of a series of transfers that, on belief, caused SunTrust to terminate its deposit and merchant services relationships with Dandridge and companies he owned or controlled.

72. As referenced on **Exhibit C**, between September 14, 2011, and November 23, 2011, Dandridge directed eight wire transfers, totaling $371,382, from Mrs. Kinder's IRA and from her daughters' custodial accounts into Runnymede 6930.

73. As referenced on **Exhibit D**, Dandridge then directed SunTrust to initiate electronic funds transfers totaling $190,578.40 to SunTrust's account debtor Dandridge, via transfer from Runnymede 6930 to Dandridge 5935.

74. In addition, and as referenced on Exhibit D, Dandridge directed SunTrust to transfer an additional $194,000 to SunTrust's debtors Timberlake and Wycliffe, via transfers from Runnymede 6930 to Timberlake 9555 and Wycliffe 9571:

 a. Timberlake - $80,000 – 9/26/2011

 b. Timberlake - $70,000 – 9/28/2011

 c. Timberlake - $40,000 – 10/13/2011

 d. Wycliffe - $4,000 – 10/19/2011

75. Dandridge made each of these transfers, totaling $384,578.40, with the intent to defraud Mrs. Kinder and her daughters.

76. On or about November 22, 2011, SunTrust informed Dandridge that, effective no later than December 23, 2011, it was terminating its deposit relationships with Dandridge, Runnymede, Timberlake, and Wycliffe.

77. By separate notice to Dandridge, SunTrust also terminated its merchant services agreement with Timberlake effective December 7, 2011. Notice letters attached hereto, collectively, as **Exhibit F**.

78. SunTrust senior management reviewed the decision to terminate the Dandridge-related accounts.

79. By terminating these accounts without notice to Mrs. Kinder, SunTrust depleted its collateral pool for the Commercial Note, thus further affecting the Kinder family and their home.

80. At the time of the transactions, SunTrust was aware or should have been aware of Runnymede's and Dandridge's fraudulent intent.

81. Notwithstanding SunTrust senior management's approval of the termination of the Runnymede, Dandridge, Timberlake and Wycliffe accounts, SunTrust did not reverse any Kinder or Runnymede transfers, nor did it notify Mrs. Kinder in her capacity as beneficial interest holder in Runnymede 6930, as unwitting collateral volunteer for the Commercial Loan, or as custodian of her children's accounts.

82. Notwithstanding SunTrust senior management's approval of the termination of the Runnymede, Dandridge, Timberlake and Wycliffe accounts, and depletion of its collateral pool, SunTrust did not call the renewed Commercial Loan and, as described below, it immediately continued to take payments on it.

83. SunTrust's focus on Dandridge's interests, and on its own interests, would alter Mrs. Kinder's and her children's lives forever. Over the next five years, Dandridge and the companies he owned or controlled would pay off SunTrust in whole yet cause catastrophic losses to Mrs. Kinder and her family. The statement of Kate Kinder, relied upon at Dandridge's sentencing hearing is attached hereto, incorporated herein, and labeled **Exhibit G** for identification purposes.

SunTrust Continues to Take Payment From Dandridge and His Entities

84. SunTrust continued to deposit funds paid to it by Runnymede and by Dandridge (and others) with funds that originated with Runnymede and Mrs. Kinder.

85. On January 31, 2012, less than two months after the termination notices, Dandridge directed an additional $100,000 in Kinder Funds into his new Runnymede Bank of America ("BOA") account and sent them from Runnymede to SunTrust, on belief in tardy

satisfaction of the annual principal curtailment under the renewed and extended Commercial Loan.

86. One year later, on or about January 31, 2013, Dandridge attempted to make a $100,000 payment to SunTrust via Dandridge Bank of America ("BOA") Account ended 4385. The payment was late, per the Commercial Note, and was made via check returned by BOA for insufficient funds.

87. On February 14, 2013, after Dandridge deposited into his BOA account additional funds received from a Bank of New York Mellon Account that was funded, on belief, by Runnymede, Dandridge resubmitted the returned check to SunTrust and SunTrust deposited it in partial satisfaction, on belief, of the 2013 Commercial Note principal curtailment.

88. SunTrust received hundreds of thousands of dollars in payment of loans owed by Dandridge and Dandridge related entities that originated with the Runnymede Transfers Out.

89. At the end of the day, SunTrust ignored notice of Dandridge's and Runnymede's fraudulent intent en route to receiving payment in full of approximately $ 2 Million on loans to Dandridge and entities other than Runnymede.

90. By virtue of Dandridge's and Runnymede's concealment from Kinder of the Runnymede Transfers Out to Dandridge, Timberlake and Wycliffe, and because of SunTrust's mute acceptance of payment from Runnymede and Dandridge while on notice of their intent to defraud, Mrs. Kinder, her daughters and others suffered greatly.

The remainder of this page is intentionally left blank.

WHEREFORE, for the foregoing reasons, W. Stephen Scott, Chapter 7 Trustee, by counsel, requests entry of an order avoiding the Runnymede Transfers Out to SunTrust or, in alternative, granting judgment against SunTrust in the amount of $3,294,694.52 and for his attorneys' fees and costs expended herein, for interest from the date of judgment at the judgment rate, and for such other and further relief as this Court deems just.

W. STEPHEN SCOTT, TRUSTEE

By: *__/s/ John M. Ryan___*

John M. Ryan, VSB No. 37796
CROWLEY, LIBERATORE, RYAN & BROGAN, P.C.
150 Boush Street, Suite 300
Norfolk, VA 23510
Telephone: (757) 333-4500
Facsimile: (757) 333-4501
jryan@clrbfirm.com

*Counsel for W. Stephen Scott, Trustee*